UNITED STATES of America, Plaintiff-Appellee,

v.

Raul SALDIVAR, Sr., Raul Saldivar, Jr., Defendants-Appellants.

No. 82–3012.

United States Court of Appeals, Eleventh Circuit.

July 25, 1983.

Rehearing and Rehearing En Banc Denied Sept. 30, 1983.

Claude H. Tison, Jr., Tampa, Fla., for defendants-appellants.

Manuel Menendez, Asst. U.S. Atty., Tampa, Fla., Janis Kockritz, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RONEY and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from the conviction of a father and son following a joint trial in which the father was charged in four counts and the son in two counts of aiding and abetting others in transporting illegal aliens within the United States.

The appellants' contentions fall into six categories:

 I. Were these appellants properly joined for trial?

 II. Was the testimony of two government witnesses barred by the principles of collateral estoppel?

III. Did the district court commit plain error in excluding appellants' proffered character testimony?

IV. Did the trial court err in its handling of the cross-examination of appellant Saldivar, Sr. and the closing arguments by government counsel?

 V. Were the judgments of conviction adequately supported by the admissible evidence?

VI. Did the trial court commit reversible error in granting the government a three months continuance for the commencement of the trial?

PREAMBLE

These two appellants, father and son were jointly indicted with a number of others in a 20 count indictment, the first count of which alleged a conspiracy to commit all the other counts. The case went to trial in the district court in Arizona. At the conclusion of the introduction of evidence in that earlier trial, the court directed a verdict of acquittal on the conspiracy count because, as it stated, "The evidence is more susceptible of the interpretation that more than one conspiracy existed." The United States dismissed a number of the counts, and the jury, while acquitting Saldivar, Jr. on several of the counts alleging that he had acted jointly with his father and acquitting Saldivar, Sr. on a number of counts in which he is alleged to have acted jointly with his son, was then unable to agree upon the guilt or innocence of the remaining party. The case was then transferred to the Southern District of Florida for the second trial.

Much of the complaint of the appellants in the court below, and now here, arises from the refusal of the trial court to rule out in advance of trial the offering by the government of any of the evidence introduced at the Phoenix trial which might tend to show an agreement between father and son to violate the statute and the refusal of the trial court to sever the four counts remaining alive against the father from the two counts remaining alive against the son.

I. *Were these appellants properly joined for trial?*

The Federal Rules of Criminal Procedure authorize the joinder for trial of separate counts against separate individuals alleged to have committed separate crimes, provid-

ed the explicit requirements of the Rule are met. The Rule provides as follows:

> *Joinder of defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P., Rule 8(b). The six counts of the indictment here alleged four successive acts in approximately a one year period by Saldivar, Sr. and two separate acts following immediately after and within a total of two years for the entire six by Saldivar, Jr. Each count charged in the following terms (except that the name of the third parties differed in each):

> On or about November 1978 in the District of Arizona and elsewhere Frederico Villalon [and] Raul Saldivar, Sr. . . . did aid and abet the transportation and movement by means of a motor vehicle from the District of Arizona to Bonita Springs, Florida, Angel Gonzales Hernandez an alien not duly admitted by an Immigration officer and not lawfully entitled to enter and reside within the United States in order to further the alien's being in the United States illegally, and they then knew that the alien was in the United States in violation of the law and they then knew and had reasonable grounds to believe that the alien's last entry in the United States occurred less than three years prior to November 1978.

> In violation of Title 8, United States Code, Section 1324(a)(2) and Title 18, United States Code, Section 2.[1]

The appellants correctly say that there is nothing on the face of these six counts of the indictment that connects them as having participated in the criminal conduct alleged. Appellant claims that the question whether the standards required by Rule 8 have been met must be tested from the face of the indictment itself and that the trial court erred in not severing the cases for trial. Each appellant urges that this was prejudicial to him because a jury which should be hearing only evidence against him also heard evidence against the other defendant charged in a separate count of the indictment.

While the indictment, standing alone, might not have clearly shown any connection between Senior and Junior except that of father and son, since it did not allege even a joint ownership of their Bonita Springs farm or their successive operations of their labor contract business, the law is clear in this Circuit that the correctness of the trial court's ruling on a Rule 8 motion depends not only on what is literally contained within the four corners of the indictment but also on "the evidence adduced at trial." *United States v. Leach,* 613 F.2d 1295, 1299 (5th Cir.1979).[2] *See also, United States v. Butera,* 677 F.2d 1376, 1385 (11th Cir.1982) where this Court adopted the *Leach* standard:

> The offenses charged in this indictment, however, are related and the facts as alleged *and proved* show a substantial identity of facts and participants. The indictment itself reflects sales of increasing quantity. In its pretrial response to DeNoma's motion for severance, the government stated that the facts at trial would show a single objective, that is, a large-scale narcotics transaction, and that each individual transaction was meant to lead up to the succeeding transaction. *These allegations were indeed borne out by the facts developed at trial. See United States v. Leach,* 613 F.2d 1295, 1299 (5th Cir.1980) (propriety of joinder determined from indictment, *pretrial proceed-*

---

1. Original Count 10 included the name of Raul Saldivar, Jr., but at the Phoenix trial, Saldivar, Jr. was acquitted on Count 10, so the count remaining for trial in the Southern District of Florida is as set out above.

2. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

*ings and record at trial* ) .... (Emphasis added.)

677 F.2d at 1385. Here, the evidence adduced by the government or conceded by the defendants showed that the father and son were jointly operators of their farm which was employing migrant labor and that the father, subsequently the son, was the proprietor of a labor contract agency for other farm owners of the neighborhood. Several of the witnesses testified that they were paid amounts of money by both father and son after their arrival in Florida. There is certainly a unity of time in that all six alleged acts by the father or by the son came within a two year period, and at the time of the harvest season. Certainly, if all of these facts had been alleged in each of the six counts of the indictment there would be no doubt about the propriety of their being joined under Rule 8. Since the court, in determining the correctness of its refusal to dismiss for improper joinder may consider the "pretrial proceedings and record at trial," *Butera, supra,* we conclude that the trial court did not err in denying appellant's motion to dismiss for improper joinder.

II. *Was the testimony of two government witnesses barred by the principles of collateral estoppel?*

Prior to trial, appellants moved *in limine* to bar the government from introducing evidence it had previously introduced in support of the conspiracy count. The court observed that not all facts previously introduced are barred from relitigation, but rather only those ultimate facts which were determined in appellants' favor at the prior trial. The court then directed that the government make offers of proof at trial, since the court could not determine prior to trial which facts might be barred from relitigation by the principle of collateral estoppel. Thereafter, appellants continued to object to the admission of any testimony that had been admitted to prove the conspiracy, except for those incidents

which related to Counts 12 and 13. Appellants particularly objected to any evidence of Saloman Graham's and Ruben Villegas's trips, trips alleged in Counts 12 and 13; they could not object to the court's permitting the jury to consider the testimony of these witnesses as to Counts 12 and 13 because Count 12 charged that the aiding and abetting was with a "coyote"[3] furnished by Graham (12) and that Count 13 charged the aiding and abetting was done with a coyote furnished by Villegas. They objected to the court's permitting the jury to consider their testimony tending to show knowledge and intent in a continuing relationship between the Saldivars and each of the coyotes used in the trips described in the other counts. In addition to the ground of collateral estoppel, they contend this evidence related, so far as concerned the other four counts, to extrinsic evidence of other crimes and was thus inadmissible under Federal Rules of Evidence 404(b). They contend that the judge in their first trial had concluded that there was no agreement between Graham and Saldivar, Sr. and none between Villegas and Saldivar, Jr. They, therefore, claimed that all evidence tending to show that there was such an agreement should be barred on retrial. Further, appellants contended that because they were acquitted of conspiracy, the issue of intent necessarily had been decided in their favor and no facts could be reintroduced which supported the intent element.

We consider the last argument first. The original trial court stated that its reason for dismissing the conspiracy count was that it was apparent that the government had proved more than one conspiracy. As we consider the record, it is plain that the trial court in Phoenix found a variance between the allegation of a single conspiracy in Count 1 and the allegations of joint action by several different other people in the additional 19 counts of the indictment. So, if the trial court determined anything at all about the allegations of joint action between Saldivar, Sr. and Graham or Villegas

---

**3.** A "coyote" is understood by all parties to be a person who transported alien workers for profit to himself.

it was that there had been sufficient proof from which the jury could have decided such agreements did exist, entirely separately from the conspiracy alleged in Count 1. Obviously, therefore, there had been no finding of fact or any other disposition in favor of the Saldivars that they had not conspired or had agreements with each individual named in the subsequent counts. Thus, the collateral estoppel issue was correctly decided in the court below.

 Considering the question as to what was decided in the first trial with respect to the substantive counts (*see* fn. 1, *supra*), action between one of the Saldivars and someone else, the acquittal of Saldivar, Jr. on Counts 10, 11 and 12, merely held that he had not aided and abetted the principal named in those counts and the acquittal of Saldivar, Sr. on Counts 13 and 19 meant only that he had not aided and abetted the persons named in those two Counts.

With respect to the claim dealing with the admissibility of statements of other crimes, it is plain that the element of knowledge as to the illegal status of the aliens is an essential element of proof in each of these counts. Proof of knowledge of each of these defendants may appropriately be established by showing that they repeatedly paid for the transportation of illegal aliens with knowledge that all of the transportation of these persons from Phoenix, Arizona to Bonita Springs, Florida involved illegal aliens. The proof that was supplied by Graham and Villegas colored the entire range of activities that were engaged in by these defendants as alleged in all six counts. The trial court, therefore, did not err in admitting this evidence. Moreover, as conceded by the appellants, the trial court gave a special charge to the jury, limiting the evidence to the particular defendant as to whom it was proper to consider it.

III. *Were the judgments of conviction adequately supported by the admissible evidence?*

The appellants here treat the several counts differently as to the sufficiency of the evidence. With respect to Count 5 and Counts 10, 11, 12 and 13 (all but 13 involving Saldivar, Sr.). Appellants stated in their brief:

> At the outset, it is acknowledged that there was some evidence on each count (except count 19) which could support a conclusion that at some time before or after the transportation, the charged had knowledge of the illegal status of the alien named in that count. . . .

Saldivar, Jr. singles out Count 19 because he contends that there was no proof of any act by him until after the transportation had been completed and the illegal aliens deposited in Florida.

 With respect to all but Count 19, there was evidence to the effect that the defendant had communicated either with an illegal alien or someone purporting to act on his behalf as a coyote and at least on some of the transportations of aliens from Arizona to California the Saldivars took part of the transportation money which was charged to the individual alien by the person who drove the van or other vehicle taking them to Florida. There is also evidence that some of the illegal aliens were told by Saldivar what to do in case "the Immigration came" and, in one instance, Saldivar, Sr. recommended to the person with whom he arranged for the transportation that he should use other drivers rather than to bring the aliens himself, because of the likelihood of his getting caught. This evidence to the effect that before transportation was undertaken on behalf of the illegal aliens one of the defendants had agreed to "respond," as they called it, or to advance the transportation money to the coyotes, and that he did in fact do so upon arrival in Florida, coupled with the proof of knowledge of the defendants that the persons transported were illegal aliens clearly sets out sufficient facts from which the jury could convict in five of the Counts.

With respect to Count 19, Saldivar, Jr. contends that he had no agreement in advance of the transportation of the 11 illegal aliens from Arizona to Bonita Springs, Florida; that he agreed, when these persons

showed up at his farm to advance to the coyote the cost of their transportation and that this could not amount to aiding and abetting because the transportation had already been completed. In making such argument, appellant overlooks critical testimony given by the witness Monroy who was responsible for bringing the load of aliens to Florida. He testified, that upon arrival at Bonita Springs, Saldivar, Jr. said he would "respond"[4] for the transportation. When asked what he understood by Saldivar's agreement to respond, Monroy said "that he had already ... *he said* he was already in *agreement with the coyote.*"[5] (Emphasis added.)

With this statement by Saldivar, Jr. that he was already *in agreement* with the coyote on arrival in Florida, there is ample proof of aiding and abetting as charged in Count 19.

IV. *Did the district court commit plain error in excluding appellant's proffered character testimony?*

Appellants complain that the trial court improperly restricted their character evidence to testimony touching only on their reputation for truthfulness in the community. They contend that the Court of Appeals for the Fifth Circuit has established the rule that a criminal defendant may be permitted to show his reputation for "law abidingness," as a "trait" relevant to any crime charged. This much is conceded by the government. *United States v. Hewitt,* 634 F.2d 277 (5th Cir.1981); *United States v. Darland,* 626 F.2d 1235 (5th Cir. 1980); and *see also United States v. Angelini,* 678 F.2d 380 (1st Cir.1982).

The answer to appellant's claim here, however, is that the first witness questioned with respect to defendants' character was permitted to state that the defendants both had reputations in the community of Bonita Springs of being "honest, peaceful, and law-abiding citizen[s]." The question asked of this witness and his answers were as follows:

I am talking about just Raul Saldivar, Sr. Do you know what Raul Saldivar, Sr.'s reputation in the community of Bonita Springs is, insofar as being an honest, peaceful, and law-abiding citizen?
A. Yes. His reputation is very good.
Q. What about Raul Saldivar, Jr., his son?
A. And the same for him.

The matter dealing with the defendants' reputation for truthfulness in the community was then broached by their counsel who then asked them: "Do you know what the reputation of Raul Saldivar, Sr. is in the community of Bonita Springs insofar as his truthfulness is concerned?", the witness answered: "Yes he is, as far as I am concerned." There then followed the following colloquoy in which the court participated:

THE COURT: Mr. Tison, limit the witness's answer to your question.
Q. My question, sir, is do you know what the reputation—are you familiar with his reputation; not what it is, but just do you know.
A. Yes.
Q. Okay. Now, what is that reputation?
A. His reputation is good for being a man of his word....
THE COURT: Mr. Quinn, the question is, are you familiar with his reputation for truthfulness.
THE WITNESS: Yes, I am.
THE COURT: All right. State what that reputation is.
Q. As far as truthfulness is concerned.
A. His reputation for truthfulness, in my own personal experience—
THE COURT: Mr. Quinn—
Q. Not your personal opinion, but his reputation in the community, what people

---

4. The record is replete with explanations that the word "respond" meant to these aliens and to the defendants that one of the Saldivars would advance the transportation cost to the coyote.

5. It would defy common sense to believe that Monroy would transport eleven aliens from Arizona to south Florida without his having had some such agreement in advance.

in Bonita Springs at large think about him on that point.

THE COURT: You may need to lay a predicate for that, Mr. Tison.

MR. TISON: I believe I have. I have asked him if he is familiar with the reputation in the community and he said he was.

THE COURT: Well, there has to be a reputation, first.

A. He has a good reputation as an honest, upright, decent man.

THE COURT: Just a moment, Mr. Quinn.

All right. Let's do it properly, Mr. Tison.

MR. TISON: Okay.

Q. Please listen very precisely to the particular question I ask. Don't answer more broadly than I ask it.

Do you know whether Paul Saldivar, Sr. has a reputation in the community of Bonita Springs, in the community at large, concerning whether he is a truthful person? Do you know whether he has a reputation as to that particular trist of his character? Do you know what people there think about him?

A. They think he is a truthful person.

Q. No. Just do you know.

A. Yes.

Q. Okay. And do you know that he has a reputation oneway or another in Bonita Springs on that particular point?

A. Yes.

Q. Okay. Now, what is that reputation of Raul Saldivar, Sr., as far as being a truthful person is concerned, what is his reputation in the community; what do the people in Bonita Springs think about him as far as whether he is a truthful person?

A. That he is a truthful person.

Q. Now, leaving aside the question of— let me ask you, too: Do you also know if Raul Saldivar, Jr. has a reputation in Bonita Springs as to whether he is a truthful person; do you know if he has a reputation?

A. I don't know on the son.

Q. Okay. As far as the community is concerned?

A. As far as the community is concerned.

Q. Now, do you have a personal opinion, based on your own experience, as to Raul Saldivar, Sr., as to whether he is a truthful person?

A. Yes, I have.

Q. And what is that belief?

A. That he is a truthful person.

Q. Now, what about Raul Saldivar, Jr.; do you have a personal opinion, based on your experience with him, as to whether he is a truthful and honest person?

A. Yes, I have.

Q. I will ask you, sir, if Raul Saldivar, Sr. made a statement to you under oath about an important matter—

THE COURT: Just ask whether or not he has an opinion as to the truthfulness of the parties, Mr. Tison, and what that opinion is.

MR. TISON: Yes, your Honor.

I have nothing further.

Thereafter, when the two subsequent witnesses were questioned with respect to the character of the defendants, counsel asked the following questions: "Do you know whether Raul Saldivar, Sr. has a reputation in the community of Bonita Springs concerning whether he is a peaceful and law-abiding citizen?"

To this question the witness answered: "Yes, I do." The court then stated: "Mr. Tison, confine your inquiry to his reputation to truthfulness." Thereafter, the only questions asked of this and a subsequent witness dealt with the reputation of the two Saldivars for truthfulness. Both witnesses testified to their reputation in the community as being truthful persons and that in their respective opinions the two defendants' reputation for truthfulness was at the highest.

Aside from the fact that no proffer of expected testimony was placed in the record as to these two witnesses who were not permitted to testify to any trait of character other than that of truthfulness, it is

clear that any error occurring in the restriction of the character evidence was harmless beyond a reasonable doubt. Both Saldivars testified in their own behalf. The jury heard the testimony from the first character witness that their reputation in the community in which they lived is of honest, peaceful and law-abiding citizens and further that their reputation for honesty and truthfulness was of the highest. They also heard from the other two witnesses evidence of the existence of the reputation for truthfulness of the two Saldivars in the community in which they lived. It is not entirely clear why the trial court restricted the evidence of the last two witnesses to the existence or nonexistence of a reputation for truthfulness. It did not do so until after the first witness was permitted to testify as to the law-abidingness of the two. The truthfulness of the defendants' testimony as to their lack of knowledge as to the illegal status of the aliens was the critical issue touching on guilt or innocence in this case. If the jury was to believe, and give effect, to the reputation for honesty and truthfulness in the community of the two defendants, it would have believed their testimony and discounted that of the government's witnesses. With the evidence of one witness of the law-abiding character of the two defendants in addition, we are convinced that the failure of the trial court to permit similar testimony from the other two character witnesses could not have affected the jury's verdict.

V. *Did the trial court err in its handling of the cross-examination of appellant Saldivar, Sr. and the closing arguments by government counsel?*

A. The first question here arises from the cross-examination of the defendant, Saldivar, Sr., who had testified as to activities performed by him as a labor contractor. One problem arises from the fact that no objections were made to specific questions put by the government. Another arises from the fact that the inquiry dealt with the cancellation by the United States Department of Labor's license to Saldivar, Sr. to act as a labor contractor which written notice of cancellation was not put in evidence.

The questions, the comments of counsel, and the relevant part of the court's ruling follow:

Q. In 1978, for part of that year, did you work as a farm contractor?

A. I gave it all to a son.

Q. Is that son of yours Raul Saldivar, Sr.—Junior. I am sorry.

A. Yes.

Q. The person who is sitting over here in court?

A. Yes.

Q. And what did you do to give this work of yours of the farm labor contractor to him?

A. Because I started my ranch or farm. I had already had a year of having started it.

Q. In 1977, you did work as a farm labor contractor?

A. Yes.

Q. And you had a permit from the United States Department of Labor, didn't you?

A. Yes.

MR. TISON: If your Honor please, I think that is improper cross....

THE COURT: ... He is going to ask the witness whether it is not a fact that his license or permit was revoked by the proper authorities. If the witness answers that it was not, then he is bound by that answer. If he answers that it was, then he is the one that knows.

The following questions and answers then resulted:

Q. Mr. Saldivar, in 1977, you did have a permit from the U.S. Department of Labor?

A. Yes.

Q. Mr. Saldivar, were you aware, while you had a permit, that a registered farm labor contractor was not allowed to hire illegal aliens?

A. Yes.

Q. And in 1978, Mr. Saldivar, the U.S. Department of Labor made a determination to refuse to renew your certificate for 1978, is that correct?

A. Yes.

Q. And it was at that time that your son became a registered farm labor contractor?

A. Yes.

Finally, on redirect, the following testimony was elicited by Saldivar, Sr.:

Q. Mr. Saldivar, Mr. Menendez asked you about your license. When was it that you started operating your own farm?

A. In 1977.

Q. And was it early in 1978 that your son applied for his license?

A. When he got his license, I gave him charge.

Q. Now, at the time you got this letter from the Labor Department, did your son already have his license at that time?

A. Yes.[6]

Q. Now, that letter told you you could do two things, correct?

A. Yes.

Q. You could either hire a lawyer and have a hearing about whether you would have a license the next year or you could just let your license expire at the end of the year and do nothing, is that right?

A. Yes, because I started my ranch and he took over with the license. *I didn't want any more complications.*

Q. Since your son already had his license, was there any reason for you to go have a hearing about yours?

A. No. I already had the ranch. What did I want it for? (Emphasis added.)

As noted above, it is difficult to determine precisely what question by government counsel was objected to. Initially, we hold it was permissible cross-examination for counsel to obtain an affirmative answer to the question: "And you had a permit from the United States Department of Labor, didn't you?" Defense counsel then undertook to state to the trial court out of the

hearing of the jury that it would be improper for the government to attempt to show that the Department of Labor had revoked the license at the time that the labor contract business was turned over by Saldivar, Sr. to his son. However, counsel did not move to strike the answer already given and did not object to any of the questions that were then asked following the bar conference. Instead, counsel on redirect, undertook to show that the real reason for the transfer of the business from father to son was that the father had started his ranch. It is interesting to note, however, that Saldivar, Sr. did state: "I didn't want any more complications."

Since the father's original answer to the question, which apparently he understood as an inquiry as to the reason why he gave this work as labor contractor to the son,[7] was to the effect that he had given his son the labor contract business because he no longer needed it because of having started his own farm, it was competent for the government to cross-examine him as to whether the transfer of the contractor business was not a result of the revocation by the Labor Department of his labor contractor license. The fact that Saldivar, Sr. stated that in 1978 the Labor Department made a determination to refuse to renew his certificate and the fact that he stated that part of the reason that he transferred the business to his son was that "he didn't want any more complications" was the result of permissible cross-examination.

■ B. We have carefully considered the argument by appellants that the trial court erred in not striking part of the government counsel's argument to the jury. The principal argument revolves around the speculative question asked by the prosecuting attorney based on the testimony given by witness Quinn. Quinn had testified that he was developing a trailer park adjacent to

6. The letter from the Department of Labor was sent on October 16 and Saldivar, Jr.'s license was issued on October 19.

7. The court had on one occasion concluded that Saldivar, Sr. needed to testify through an interpreter and also concluded that he had an imperfect understanding of the interpreter's Spanish translations. It is clear from the quoted part above that his answer to the question "what did you do to give this work of yours of the farm labor contractor to him," was understood by him to be a question as to "why" he gave the work to the son. His answer was: "Because I started my ranch or farm. I had already had a year of having started it."

the Saldivar camp, that he had a common sewage system with the Saldivars and that he was going to have trailers that he would rent out. The comment objected to by appellants was: "Mr. Quinn, who is developing that trailer park, he calls it, where he is going to have some trailers right next to the Saldivar camp and he is going to rent those out. I wonder to who."

In light of evidence to the effect that the Saldivars had an overflow camp called "El Monte," without running water or electricity where they temporarily housed alien workers, we conclude that it was not inappropriate for government counsel to imply to the jury that Quinn's business interests may have in some degree coincided with that of the Saldivars in the building of the trailer camp. We find no error with respect to any other parts of the argument to the jury.

VI. *Did the trial court commit reversible error in granting the government a three months continuance for the commencement of the interrogation?*

 This contention by appellants is based on the fact that shortly before the scheduled trial date, the government moved for a continuance because of the fact that counsel who had tried the earlier case in Arizona was now no longer an employee of the government. The contention is that the government had known some two months before filing the motion for continuance of this fact, but implied in its motion that it had just learned of the unavailability of counsel. The trial court granted the motion as authorized by 18 U.S.C. § 3161(h)(8)(B)(iv) which provides that a continuance may be considered excludable time under the Speedy Trial Act if the court decides that failure to grant the motion would unreasonably deny the government continuity of counsel or reasonable time necessary for effective preparation. The defendants originally did not object to the granting of the motion for continuance. However, later they filed an amendment to their response in which they objected on the ground that the continuance would interfere unduly with the business of the de-

fendants in their farming operation. Based upon the motion and the objection, the trial court granted the continuance. Thereafter, defendants filed a motion to dismiss the indictment, contending that the government's motion impliedly represented to the court that the government had not been aware until just before filing its motion of the unavailability of its Phoenix counsel. Particularly in view of the fact that the previous setting of the case had been vacated upon motion of defendants and a continuance granted by the court beyond the date at which the Phoenix counsel would have been available to try the case, we conclude that the trial court did not err in overruling the motion to dismiss the indictment based upon the alleged misrepresentation by the United States. There was no indication by anything presented by the defendants that they were in any way prejudiced by the delay. We conclude that on the papers before it the trial court did not abuse its discretion in granting the delay as excludable time under the Speedy Trial Act.

CONCLUSION

The judgments are AFFIRMED.