UNITED STATES, Appellee,

v.

Greg W. VANDELINDER, Airman Apprentice, U.S. Navy, Appellant.

No. 48,472.

NMCM 83–2323.

U.S. Court of Military Appeals.

May 13, 1985.

For Appellant: *Lieutenant Commander Cynthia J. Clemens*, JAGC, USN (argued); *Lieutenant Commander William A. De-Cicco*, JAGC, USN, and *Lieutenant Lois B. Agronick*, JAGC, USNR (on brief).

For Appellee: *Lieutenant Commander R. Clayton Seaman, Jr.*, JAGC, USN (argued); *Captain W. J. Hughes*, JAGC, USN.

*Opinion of the Court*

EVERETT, Chief Judge:

A special court-martial with members tried appellant for violating Article 1151, U.S. Naval Regulations, by wrongfully possessing, transferring, and selling five "hits" of a controlled substance on June 1, 1982, and another five "hits" on June 7, 1982, which was contrary to Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892.[1] Upon his pleas of not guilty, Vandelinder was acquitted of the offenses that

---

1. Two specifications seeking to allege other drug violations were dismissed as defective on defense motion.

allegedly had taken place on June 1, but was convicted of the June 7 crimes. The adjudged sentence was a bad-conduct discharge, confinement for 90 days, forfeiture of $382.00 pay per month for 3 months, and reduction to the lowest enlisted grade. The convening and supervisory authorities approved the findings and sentence; and the Court of Military Review affirmed (Senior Judge Gladis dissenting). 17 M.J. 710 (1983).

The grant of review by this Court concerns the following issue that divided the members of the Court of Military Review:

WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF APPELLANT IN EXCLUDING EVIDENCE OF APPELLANT'S GOOD MILITARY CHARACTER OFFERED ON THE MERITS.

I

Special Agent Bryon Taylor of the Naval Investigative Service (NIS) testified that on June 1, he, another NIS agent, and Bruce Green, a confidential informant, drove from his office at Naval Air Station, Miramar, to the 4600 block of Bancroft Street in San Diego. Green, who was assisting NIS because he had been under investigation for drug activity about a month before, was searched to assure that he had no drugs. He walked from the car to an apartment complex at 4741 Bancroft Street where appellant resided. After being in the apartment house for seven to ten minutes, Green returned to the car; and they drove back to the NIS office. Green then delivered to Mr. Taylor "one piece of brown construction paper containing five spots, each representing one hit." A search of Green "revealed that the money that we had previously given him was no longer on his person and that there were no additional controlled substances on his person."

On June 7, these events were repeated, the only difference being the presence of another informant, George Bendel, who observed the purchase. "[R]ight after the second sale," a man identified by Green and Bendel as Vandelinder came out of the

apartment house. This person was "the blond-haired chap that's somewhat overweight with two green stripes, sitting next to" defense counsel. According to Special Agent Taylor's Surveillance Data Sheet for June 1, they arrived at Bancroft Street at 3:02 p.m.; Green entered the apartment complex three minutes later and exited at 3:07. The data sheet for June 7 recited that Green and Bendel entered the apartment complex at 3:31 and left it at 3:36.

Bruce Green, who was a civilian at the time of trial, was a member of appellant's squadron on June 1, 1982. Some time after 1:00 p.m. on that day, he saw Vandelinder at his apartment on Bancroft Street and bought "five hits of suspected acid" from him. Those "hits" were delivered to Special Agent Taylor and were a prosecution exhibit at the trial. Green testified that he went to work for NIS because "during an unscheduled health and welfare inspection" in April 1982, he had been "written up for urine sample."

After the court accepted the stipulated testimony of a forensic chemist and took judicial notice of the applicable Navy Regulations, the Government rested. Then the defense opened its case by offering the stipulated testimony of AD1 Terry Lucas that appellant "worked for" him "during the period January ... to April 1982"; that in his "opinion" appellant "is an honest individual, and based on this, I would believe him to tell the truth under oath"; and that appellant "normally reported to work early for duty on midcheck."

Next the defense offered in evidence the documents which give rise to the present appeal: appellant's Enlisted Performance Record (NAVPERS 1070/609) from his date of enlistment in 1979 through August 1982 and Enlisted Performance Evaluations (NAVPERS 1616/5) covering June 12, 1982, to August 6, 1982; February 1, 1982, to June 10, 1982; December 30, 1980, to January 31, 1982; and February 1, 1980, to December 30, 1980. The Evaluations, one of which is appended to this opinion, provide blocks for rating five "traits": 1. professional performance; 2. military behav-

ior; 3. leadership and supervisory ability; 4. military appearance; and 5. adaptability. Space also is provided for a "description of assigned tasks" and "evaluation of performance"—the latter to include comments on "performance in the area of equal opportunity" and "interactions with foreign nationals." The Enlisted Performance Record contained numerical ratings as to the same five traits which are the subject of the reports.

Trial counsel objected that the five exhibits offered by the defense "do not properly fall under any of the provisions of Rule 404 of the Military Rules of Evidence or under 405 either." The defense responded that the exhibits were being offered under Rule 404(a)(1) "to show the relevant character trait, military character." Defense counsel pointed out that appellant had been charged with violating a general regulation and that, according to the Drafters Analysis of Mil. R. Evid. 404, "evidence of good military character" is admissible in a prosecution for disobedience of orders.

The military judge sustained the Government's objection because

the general consensus is that it's not considered a military offense as set out in the example, because general military character would not be a particular trait that would be relevant to the nature of the offenses which are basically wrongful possession, transfer and sale, as opposed to violation of an order.

Thereafter, appellant testified that in May and June, he was assigned to the nightcheck shift with his squadron at Naval Air Station, Miramar; and he had been living in a two-story apartment complex on Bancroft Street. The complex contained three units on each floor; and appellant lived upstairs. His apartment was some ten to fifteen miles from Miramar; and he needed twenty to twenty-five minutes to travel this distance and another seven to ten minutes to dress in a work uniform. Appellant did not recall having been late for work. Since he was required to be on duty by 2:45 p.m., normally he would leave

for work between 1:30 and 1:40 in order to arrive early.

Appellant "absolutely" denied that he transferred any drugs to Bruce Green on June 1 or 7 or had received any money from him on those dates. Although he knew Green, who was attached to his squadron, they did not get along "at all" and never socialized with each other. Indeed, he never liked Green. Early in 1982, an incident with Green resulted in threats by Green on three or four occasions that appellant's "turn was up."

Green visited the apartment next to appellant—which was occupied by an unemployed tuna fisherman about 25 years old and two other men of unknown occupation who were about the same age. Appellant "absolutely" denied that he had ever been present in his own apartment when Green was there. However, he acknowledged that Green was a friend of appellant's roommate, Kevin Murphy—a sailor "who worked early crew .... Murphy could have brought him in there at one time."

Petty Officer Ronald F. Dorsey testified for the defense that Vandelinder worked with him on nightcheck. With respect to appellant's honesty, he replied that "he [has] always been honest toward me and he never had any problems when he worked for me." According to Dorsey, the people on the shift "had to be there, changed and dressed" by 2:45, although they were not due to work until 3:00. There are no records of who worked on June 1 or 7. Another defense witness, Petty Officer William McClenton, had contact with Bruce Green as barracks master-at-arms. In his opinion, Green "would say anything to his advantage" and would "lie." McClenton would not believe him under oath. However, he "never heard Mr. Green ... lie under oath."

In rebuttal, the prosecution called NIS Special Agent Mark Fox. At 3:50 p.m. on June 7, when Fox was with Special Agent Taylor, he saw Vandelinder at Bancroft Avenue in San Diego. George Bendel, a civilian, testified that he was in the Navy on June 7, 1982, and on that date, he, Bruce

**44**

Green, and Kevin Murphy were present with appellant in his apartment at 4741 Bancroft Street. Their purpose was "buying five hits of acid from" appellant. After they entered his apartment around 3:30 to 4:00 p.m., Bendel saw appellant "[g]o into his bedroom and get the five hits of acid." Bruce Green, who was Bendel's barracks roommate at the time, paid appellant $25.00. On cross-examination, Bendel conceded that at this time he was acting as an NIS "source or informant" because "I was busted in April of '82" for "[p]araphernalia and marihuana." Before being taken to the apartment house by Special Agent Taylor, Bendel and Green were searched at the NIS office.

## II

For several decades, the admissibility of evidence of an accused's character in a trial by court-martial was governed by this principle:

In order to show the probability of his innocence, the accused may introduce evidence of his own good character, including evidence of his military record and standing and evidence of his general character as a moral well-conducted person and law-abiding citizen. However, he may not introduce evidence as to some specific trait of character unless proof of that trait would have a reasonable tendency to show that it was unlikely that he committed the particular offense charged.

Para. 138$f$(2), Manual for Courts-Martial, 1951; *cf.* para. 138$f$(2), Manual for Courts-Martial, United States, 1969 (Revised edition); para. 125$b$, Manual for Courts-Martial, U.S. Army, 1949. Since September 1, 1980, when the Military Rules of Evidence took effect, the defense may offer only "[e]vidence of a pertinent trait of the character of the accused." Mil. R. Evid. 404(a)(1). This change has produced considerable confusion and has required this Court to determine in several cases what traits of character are "pertinent." *See,*

*e.g., United States v. Kahakauwila,* 19 M.J. 60 (C.M.A. 1984); *United States v. McNeill,* 17 M.J. 451 (C.M.A. 1984); *United States v. Piatt,* 17 M.J. 442 (C.M.A. 1984); *United States v. Clemons,* 16 M.J. 44 (C.M.A. 1983).

In the present case, appellant claimed that he was entitled to offer evidence of his "good military character" because he was being prosecuted under Article 92 for disobedience of Naval Regulations. In his view, reception of the evidence was dictated by the comment in the Drafters Analysis that "[e]vidence of good military character would be admissible, for example, in a prosecution for disobedience of orders." Appendix 18, 1969 Manual, *supra.* Contrariwise, the military judge reasoned that—although charged under Article 92—appellant really was being prosecuted for possession, transfer, and sale of a controlled substance, in violation of Article 134, UCMJ, 10 U.S.C. § 934. Unlike the "disobedience" contemplated by the Drafters Analysis, this misconduct was not uniquely military; and so "good military character" was not "pertinent."

■ We agree that admissibility of this character evidence in a drug case should not hinge on whether the prosecution is under Article 92; Article 134; or the recently enacted Article 112$a$, UCMJ, 10 U.S.C. § 912$a$. However, this premise leads us to a different conclusion from the military judge.

■ The Drafters Analysis makes clear that—whatever the term "trait" means in Mil. R. Evid. 404(a)(1)—"good military character" is a "trait."[2] We can only conclude that this trait was "pertinent" to the charge against Vandelinder in light of this irrefutable comment by Senior Judge Gladis in his dissent:

Illegal drug trafficking is a grave concern to the military. *See United States v. Middleton,* 10 M.J. 123 (C.M.A. 1981), n. 11; *United States v. Trottier,* 9 M.J. 337 (C.M.A. 1980). The campaigns of the

---

2. Likewise, the reports which appellant sought unsuccessfully to offer in evidence—prepared

on official Navy forms—purport to be rating certain "traits" of the servicemember.

Chief of Naval Operations and the Commandant of the Marine Corps to eradicate drug abuse and trafficking in the naval service have been widely publicized. The decision of a seller to participate in and accelerate the infusion of illegal controlled substances within the structure of the military organization represents a flagrant disregard for his responsibilities to his fellow soldiers, marines, sailors, or airmen, and to the armed forces of his nation. *United States v. Harvey*, 12 M.J. 626 (N.M.C.M.R. 1981). A person of good military character is less likely to commit offenses which strike at the heart of military discipline and readiness. Therefore, good military character is clearly a pertinent character trait in military drug cases. *Contra, United States v. Weeks*, 17 M.J. 613 (N.M.C.M.R. 1983); *United States v. Belz*, 14 M.J. 601 (A.F.C.M.R. 1982).

Appellate government counsel contend that "good military character" is not "pertinent" to these drug offenses which occurred off-post. However, in a number of cases involving service-connection, *see, e.g., United States v. Trottier, supra*, this Court emphasized the close relationship between off-post drug transactions and military effectiveness. Undoubtedly, the members of all the armed services have been made aware of this relationship. We believe, therefore, that a factfinder could reasonably infer that a person of "good military character" would be unlikely to participate in an activity that is so harmful to military effectiveness.

Admittedly, a diversity of views may exist as to the precise limits of "good military character." Perhaps, it does not include all the five "traits" rated on the Reports of Enlisted Performance; or perhaps it includes additional "traits." Nonetheless, we are convinced that the term has a generally understood core of meaning and that, when a witness testifies about an accused's military character, the factfinder understands generally what is meant.[3]

Testimony about someone's "good military character" almost inevitably is somewhat imprecise—just as is lay-opinion testimony that a car was being operated at a high speed or that "a person was drunk." *Cf.* Drafters Analysis of Mil. R. Evid. 701. Nevertheless, a court-martial member or military judge sitting as a factfinder will be aided by such testimony in deciding whether an accused is a person who would be unlikely to engage in drug transactions.

Instead of the testimony of witnesses, appellant offered documentary evidence of his "good military character." However, Mil. R. Evid. 405(c)[4]—which is not paralleled in the Federal Rules of Evidence—contemplates liberality in the reception of documentary evidence as to an accused's character. According to the Drafters Analysis, this rule

> is required due to the world wide disposition of the armed forces which makes it difficult if not impossible to obtain witnesses—particularly when the sole testimony of a witness is to be a brief statement relating to the character of the accused. This is particularly important for offenses committed abroad or in a combat zone, in which case the only witnesses likely to be necessary from the United States are those likely to be character witnesses.

Appendix 18, Manual, *supra*.

The drafters did not explain fully the intended scope of "other written statements" in Mil. R. Evid. 405(c); but the term must at least include remarks about a ser-

---

3. If the meaning of such testimony is unclear, the cross-examiner may ask the witness for clarification.

4. Mil. R. Evid. 405(c) states:
 (c) *Affidavits.* The defense may introduce affidavits or other written statements of persons other than the accused concerning the character of the accused. If the defense introduces affidavits or other written statements under this subdivision, the prosecution may, in rebuttal, also introduce affidavits or other written statements regarding the character of the accused. Evidence of this type may be introduced by the defense or prosecution only if, aside from being contained in an affidavit or other written statement, it would otherwise be admissible under these rules.

vicemember in his service records. Although unsworn, these entries are very trustworthy, as is attested to by their being excepted from the hearsay prohibition. Indeed, "service records" are specifically mentioned in two hearsay exceptions— "records of regularly conducted activity," Mil. R. Evid. 803(6), and "public records and reports," Mil. R. Evid. 803(8). Even if the remarks recite the opinion of an officer who has rated the servicemember, admissibility is not impaired because Mil. R. Evid. 803(6) authorizes the reception in evidence of "opinions" contained in "records of regularly conducted activity," such as "service records."

The evaluations contained in Enlisted Performance Reports are relied on by the armed forces for many purposes—such as promotion, reassignment, and separation. Therefore, whether or not the Reports offered by appellant were labelled "service records" by naval-personnel-accounting directives, they were admissible by reason of the same policy that allows reception in evidence of "service records" and other documents specified in Mil. R. Evid. 803(6) and (8). Thus, the opinions about a servicemember's military character contained in Enlisted Performance Reports are admissible as "other written statements" within the meaning of Mil. R. Evid. 405(c). The admissibility of these opinions fulfills an important purpose of Mil. R. Evid. 405(c) by permitting a servicemember to reap the benefits of the "good military character" he has demonstrated in years past, even though because of death, distance, or other reasons, his former superiors and associates may be unavailable to testify for him at his trial.

Records like those involved here present a special problem. Mil. R. Evid. 405(a) states:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-exami-

nation, inquiry is allowable into relevant specific instances of conduct.

From this language and that of Mil. R. Evid. 405(b),[5] it is clear that an accused usually is not allowed to offer through his character witnesses specific instances of his prior good conduct. Such evidence is considered too distracting and time consuming. Thus, specific instances of conduct can only be introduced through cross-examination, unless "character or a trait of character of a person is an essential element of an offense or defense." Mil. R. Evid. 405(b).

Enlisted Performance Reports and similar documents frequently recite specific instances of a servicemember's conduct. Indeed, rating officials are often encouraged to support their general evaluations by specific illustrations. Therefore, these performance reports—as in this case—may contain a substantial amount of information which is inadmissible under Mil. R. Evid. 405.

In this connection, considerable discretion must be allowed the trial judge. For example, he may receive Enlisted Performance Reports in evidence with instructions for the court members to disregard specific instances of conduct described therein. This course is appropriate if the judge believes that the court members, who often are experienced in reading such documents, will readily be able to sort out the portions which they should consider with respect to the accused's character. Other alternatives are to redact or cover a portion of the document, or to require that the parties stipulate as to the material contents of the document and only receive the stipulation in evidence.

In the case at bar, the judge never got to the point of exercising his discretion as to how the evidence should be received because he proceeded on the erroneous premise that evidence of "general military character" was not "pertinent" to the charge. Thus, his ruling cannot be sustained on the theory that he acted within

_____

5. "In cases in which character or a trait of character of a person is an essential element of

an offense or defense, proof may also be made of specific instances of the person's conduct."

his discretion by disapproving the form in which the evidence was being submitted.

### III

Senior Judge Gladis concluded that appellant was prejudiced by the error in excluding evidence of his "good military character"; and we give great weight to such an evaluation of the record by this experienced appellate judge. Appellate defense counsel also emphasize that Vandelinder was acquitted of the offenses which allegedly had occurred on June 1; and they urge that, since both drug purchases were made by the informant Bruce Green, the court members might also have acquitted appellant of the June 7 offenses if they had been allowed to consider evidence of appellant's "good military character."

 Character evidence may itself generate reasonable doubt in the factfinder's mind. *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *Edgington v. United States,* 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896). Thus, in reversing a conviction because of the exclusion of character evidence, one Court of Appeals cited *Michelson* and its proposition that "evidence of good character may in itself raise a reasonable doubt as to defendant's guilt." *United States v. Angelini,* 678 F.2d 380, 382 (1st Cir. 1982). However, we do not believe that every error in excluding defense character evidence mandates reversal even though the character evidence is weak or cumulative and the Government's evidence is overwhelming; and we observe that in several cases, convictions have been affirmed despite erroneous exclusion of character evidence by the trial court. *United States v. Saldivar,* 710 F.2d 699 (11th Cir. 1983); *United States v. Lechoco,* 542 F.2d 84 (D.C. Cir. 1976); *United States v. Lewis,* 482 F.2d 632 (D.C. Cir. 1973).

If automatic reversal is not required, what standard should be used by an appellate court in evaluating the effect of excluding the character evidence? One alternative would be to use the standard applied when an error is of constitutional propor-

tions and to require that the error be harmless beyond a reasonable doubt. *See generally United States v. Remai,* 19 M.J. 229 (C.M.A. 1985); 1A Wigmore, *Evidence* § 56 n.1, p. 1165 (Tillers rev. 1983). Apparently this standard is being employed by several Federal Courts of Appeals, *see, e.g., United States v. Saldivar, supra* at 706–07; *United States v. Lechoco, supra* at 88; and its possible applicability is recognized by others, *see Thomas v. Wyrick,* 687 F.2d 235, 241 (8th Cir. 1982), *cert. denied,* 459 U.S. 1175, 103 S.Ct. 824, 74 L.Ed.2d 1020 (1983). Another alternative is to treat the exclusion of defense character evidence as a non-constitutional error. This standard may have been employed in *United States v. Lewis, supra.*

 For the most part there has been little judicial discussion or analysis as to the proper standard of appellate review when defense character evidence is improperly excluded; and this issue has not yet been briefed or argued in this Court. Fortunately, we need not decide the question at this time, because—even if we apply the strict standard applicable to constitutional error—we are convinced beyond a reasonable doubt that exclusion of the proffered character evidence was harmless to appellant. Even though the court members were not persuaded that appellant was guilty of the June 1 offenses, we cannot find in the record of trial a basis for inferring that they would have acquitted him of the June 7 offenses if the character evidence had been received. The difference in result as to the June 1 and the June 7 charges is explained by the absence of substantial corroboration for NIS informant Bruce Green's testimony concerning the former, and the presence of overwhelming corroboration for his testimony as to the latter.

Appellant claimed that Green had never been present in his apartment when he was there; and he attempted to establish the alibi that he was at work at the time of the alleged drug transactions on June 1 and June 7. However, not only Green but also Bendel testified that on June 7 appellant

was present and sold "five hits" to Green. Most importantly, appellant's alibi for June 7 collapsed because two NIS special agents—Taylor and Fox—had seen Vandelinder leave the apartment building on that day and drive away just as the two informants were returning to the car. Once Vandelinder's alibi was gone, the court members had little choice but to convict him regardless of character evidence. Under these circumstances exclusion of the five documents had no impact on the outcome of the trial.

IV

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.[6]

Judge FLETCHER did not participate.

APPENDIX

REPORT BUPERS 1616-1

REPORT OF ENLISTED PERFORMANCE EVALUATION
NAVPERS 1616/5 (Rev. 1-79)
S/N 0106-LF-016-1626

PERIOD OF REPORT
82JUN12 TO 82AUG06

| NAME (Last, First, Middle) | SSN | RATE ABB. | PRESENT SHIP OR STATION |
|---|---|---|---|
| VANDELINDER GREG "W" | 516563458 | AA | HS-10 FRAMP |

INSTRUCTIONS

1. For each trait, evaluate the member's actual observed performance. If performance was not observed, check the "Not Observed" box.
2. Compare with others of the same rate.
3. If the major portion of work has been outside member's rate or pay grade during this reporting period, evaluate member on what ratee did. Describe work actually done in the "Comments" section.
4. Pick the phrase which best fits the member in each trait and check left or right box under it. (Left box is more favorable.)

1. PROFESSIONAL PERFORMANCE: Members skill and efficiency in performing assigned duties (except SUPERVISORY)

| NOT OBSERVED | Extremely effective and reliable. Works well independently. | | Highly effective and reliable. Needs only limited supervision. | | Effective and reliable Needs occasional supervision. | | Adequate, but needs routine supervision. | | Inadequate. Needs constant supervision. | |
|---|---|---|---|---|---|---|---|---|---|---|
| XX | * | | | | | | | | * | * |

2. MILITARY BEHAVIOR: How well member accepts authority and conforms to standards of military behavior.

| NOT OBSERVED | Always acts in the highest traditions of the Navy. | | Willingly follows commands and regulations. | | Conforms to Navy standards. | | Usually obeys commands and regulations. Occasionally lax | | Dislikes and flouts authority. Unseamanlike | |
|---|---|---|---|---|---|---|---|---|---|---|
| | * | XX | | | | | | | * | * |

3. LEADERSHIP AND SUPERVISORY ABILITY: Member's ability to plan and assign work to others and effectively direct their activities.

| NOT OBSERVED | Gets the most out of assigned personnel. | | Handles personnel very effectively. | | Gets good results from assigned personnel. | | Usually gets adequate results | | Poor supervisor. | |
|---|---|---|---|---|---|---|---|---|---|---|
| XX | * | | | | | | | | * | * |

4. MILITARY APPEARANCE: Member's military appearance and neatness in person and dress.

| NOT OBSERVED | Impressive. Wears Naval uniform with great pride | | Smart. Neat and correct in appearance. | | Conforms to Navy standards of appearance | | Passable. Sometimes careless in appearance. | | No credit to the Naval Service. | |
|---|---|---|---|---|---|---|---|---|---|---|
| | * | XX | | | | | | | * | * |

5 ADAPTABILITY: How well member gets along and works with others.

| NOT OBSERVED | Gets along exceptionally well. Promotes good morale. | | Gets along very well with others. Contributes to good morale. | | A good sailor. Helps morale. | | Gets along adequately with others. | | A misfit | |
|---|---|---|---|---|---|---|---|---|---|---|
| XX | * | | | | | | | | * | * |

6. DESCRIPTION OF ASSIGNED TASKS

STUDENT UNDER INSTRUCTION IN H3 BASIC INDOC. MILITARY DUTIES CONSIST OF HANGER AND LINE SECURITY WATCHES.

7. EVALUATION OF PERFORMANCE (Include comments on: Member's performance in the area of equal opportunity; also, member's assigned duty to overseas or CONUS-BASE deploying units which result in inter-actions with foreign nationals should be evaluated in this area.) *Comments must be justified specifically.

CONDUCT IS OUTSTANDING; SETS FINE EXAMPLE FOR SHIPMATES. PROJECTS A POSITIVE IMAGE OF THE NAVY. WEARS UNIFORM WITH PRIDE. APPEARANCE IS ALWAYS IMMACULATE AND PROPERLY DISPLAYED.

PCS TRANSFER TO HS-4
LEAVE AND TRANSIT:

6. Appellee's motion to cite additional authority is granted.

HT. 72 WT. 230

8. I have read and understand USN Regs, 1973, Art 1110.

I DO/DO NOT desire to make a statement.

Signature _____ W. VanWeldu Date 8/5/82

9. REASON FOR REPORTING

☐ ANNUAL ☒ TRANSFER ☐ OTHER _____

10. DATE 6 Aug 82

11. SIGNATURE OF REPORTING SUPERIOR

J. L. PITTS, LCDR, USN
FRAMP DEPARTMENT HEAD

NAVPERS 1616/5 (Rev. 1-79)

12. SERVICE SCHOOL(S) ATTENDED DURING PERIOD OF THIS REPORT

| INCLUSIVE DATES | SCHOOL | | GRADUATED (YES-NO) | CLASS STANDING | |
|---|---|---|---|---|---|
| IN10 X-000-0000 SQUAD INDOC | 820614 | 5 DAYS | SAT | | OF 18 |
| GS01 C-000-3271 NC-8 | 820621 | 1 DAY | SAT | | OF 23 |
| GS11 C-000-3279 MMG 1A/2 | 820621 | 1 DAY | SAT | | OF 23 |
| GS03 C-000-3278 TA-75/AS32A | 820622 | 1 DAY | SAT | | OF 23 |
| GS05 C-000-3249 PON-6 | 820622 | 1 DAY | SAT | | OF 24 |
| GS10 C-000-3272 NAN-1/-2/-3 | 820622 | 1 DAY | SAT | | OF 27 |
| H3BI X-000-0000 H3 BASIC INDOC | 820628 | 12 DAYS | SAT | | OF 02 |
| 529Z J-495-0413 AV/FF | 820712 | 2 DAYS | SAT | | OF 13 |
| 2203 C-000-3177 CORR CONTROL | 820719 | 3 DAYS | .76 | 12 | OF 13 |

13. SPECIAL QUALIFICATIONS NOT INDICATED BY RATING OR PRIMARY NEC ATTAINED DURING PERIOD OF THIS REPORT

14. OFF DUTY EDUCATIONAL ACHIEVEMENT (NCFA, college courses, correspondence courses, etc.) COMPLETED DURING PERIOD OF THIS REPORT.

COX, Judge (concurring):

I agree with Chief Judge Everett that exclusion of the character evidence proffered by appellant was error, but error which was harmless beyond a reasonable doubt. In my opinion, such a conclusion necessarily justifies affirmance of appellant's conviction on the basis of Article 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a). Yet, I likewise share his concern as to the appropriate standard of prejudice required for reversal when this type of error is found by an appellate court not to be harmless beyond a reasonable doubt. In this situation, such a conclusion may not necessarily justify reversal on the basis of Article 59(a). In this light, some comment is warranted, although it is not necessary for the resolution of the present case.

The right of a military accused to introduce pertinent character evidence at a court-martial is expressly provided for in Mil.R.Evid. 404(a)(1). *See* Art. 36, UCMJ, 10 U.S.C. § 836. The normal standard for reversal for an evidentiary-rule violation is material prejudice to "a substantial right." Art. 59(a) and Mil.R.Evid. 103(a). To my knowledge, the Supreme Court has not made any specific pronouncement as to whether this evidentiary rule or its counterpart in federal or state evidentiary codes has a constitutional dimension. *See Luce v. United States*, ___ U.S. ___, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).[1] Accordingly, reversal on the basis of this type of error *may* require a greater degree of prejudice than is required for constitutional error. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Barnes*, 8 M.J. 115 (C.M.A. 1979).[2] *Cf. United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1981 n. 7, 76 L.Ed.2d 96 (1983).

The decisions of the Supreme Court in *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), and *Edgington v. United States*, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896), do not dictate a contrary conclusion. They concerned evidentiary rulings by trial judges in federal courts before Congress enacted a comprehensive code of evidentiary rules for such trials. *See* 1 Wigmore, *Evidence* §§ 6.1(4) and 6.2(B) (Tillers rev. 1983). The Supreme Court in these decisions was fashioning evidentiary rules for federal courts, not expounding upon constitutional principles. The following excerpt from Mr. Justice Jackson's majority opinion in *Michelson* supports this conclusion:

> We end, as we began, with the observation that the law regulating the offering and testing of character testimony may merit many criticisms. England, and some states have overhauled the practice by statute. But the task of modernizing the longstanding rules on the subject is one of magnitude and difficulty which even those dedicated to law reform do not lightly undertake.
>
> The law of evidence relating to proof of reputation in criminal cases has developed almost entirely at the hands of state courts of last resort, which have such questions frequently before them. This Court, on the other hand, has contributed little to this or to any phase of the law of evidence, for the reason, among others, that it has had extremely rare occasion to decide such issues, as the paucity of citations in this opinion to our own writings attests. It is obvious that a court which can make only infrequent sallies into the field cannot recast the body of case law on this subject in

---

1. *See United States v. Lewis*, 482 F.2d 632, 636–37 (D.C. Cir. 1973); *cf. United States v. Saldivar*, 710 F.2d 699, 707 (11th Cir. 1983).

2. In the past we have equated this rule with 28 U.S.C. § 2111 and Fed.R.Crim.P. 52(a). *See United States v. Ward*, 1 M.J. 176, 180 n.9 (C.M.A. 1975). Reconsideration of this comparison and the relationship of Article 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a), to the standard for constitutional error may be appropriate. *See United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1981 n. 7, 76 L.Ed.2d 96 (1983). *Cf. Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 978 n. 2, 74 L.Ed.2d 823 (1983) (Stevens, J., concurring in the judgment).

many, many years, even if it were clear what the rules should be.

We concur in the general opinion of courts, textwriters and the profession that much of this law is archaic, paradoxical and full of compromises and compensations by which an irrational advantage to one side is offset by a poorly reasoned counterprivilege to the other. But somehow it has proved a workable even if clumsy system when moderated by discretionary controls in the hands of a wise and strong trial court. To pull one misshapen stone out of the grotesque structure is more likely simply to upset its present balance between adverse interests than to establish a rational edifice.

The present suggestion is that we adopt for all federal courts a new rule as to crossexamination about prior arrest, adhered to by the courts of only one state and rejected elsewhere. The confusion and error it would engender would seem too heavy a price to pay for an almost imperceptible logical improvement, if any, in a system which is justified, if at all, by accumulated judicial experience rather than abstract logic.

335 U.S. 485–87, 69 S.Ct. 223–24 (footnotes omitted).

Courts of Military Review and appellate counsel who address such evidentiary errors in the future should consider these issues and these concerns noted by Chief Judge Everett.