UNITED STATES

v.

**Daniel J. WEEKS, 542 48 8750, Gunnery Sergeant (E–7), U.S. Marine Corps.**

NMCM 82 5652.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 27 May 1982.

Decided 27 Feb. 1986.

CDR DAVID C. LARSON, JAGC, USN, Appellate Defense Counsel.

BARTON F. STICHMAN, Esquire, Civilian Defense Counsel.

MICHAEL P. ETTLINGER, Esquire, Civilian Defense Counsel.

LT MICHAEL MUDGETT, JAGC, USNR, Appellate Government Counsel.

Before COUGHLIN, Senior Judge, and MITCHELL and DECARLO, JJ.

PER CURIAM:

Appellant was tried by general court-martial composed of officer members on 26–27 May 1982. He was found guilty of three sets of multiplicious possession, transfer and sale of marijuana offenses involving a subordinate, in violation of Article 1151, U.S. Navy Regulations (1973) and was sentenced to a dishonorable discharge, six years of confinement and accessory punishments. The sentence was approved by the convening authority and then by this Court on 30 September 1983. *See United States v. Weeks,* 17 M.J. 613 (N.M.C.M.R. 1983) *(Weeks I).* Thereafter the Court of Military Appeals considered the case and remanded it to this Court for consideration of the issue of prejudice, holding that ex-

cluded evidence of military character was admissible on the merits at trial under Mil. R.Evid. 404(a)(1). *United States v. Weeks,* 20 M.J. 22 (C.M.A.1985) (*Weeks II*), citing *United States v. Vandelinder,* 20 M.J. 41 (C.M.A.1985).

In *Weeks II,* the Court of Military Appeals set forth the analytical scheme to be applied to the relevant facts in order to determine whether prejudice attends the error of excluding evidence of military character. This test involves consideration of the strength of the Government's case, the strength and plausibility of the defense case, the materiality of the proffered military character evidence and the quality of the proffered defense evidence and whether there is any substitute for it in the record of trial. The Court of Military Appeals did not decide whether the standard to be applied to this analysis is harmlessness beyond a reasonable doubt or merely the standard applied to all errors of non-constitutional dimension. *See United States v. Vanderlinder,* 20 M.J. at 47. We need not decide this latter issue inasmuch as we are convinced that the error was harmless even under the stricter constitutional standard. We do not understand the Court of Military Appeals to require this Court to evaluate the Government's and the appellant's cases in isolation from one another since the critical analysis must necessarily be made in some relevant context.

The essential facts of this case are set forth in *Weeks I* and are not repeated in this opinion. The following comments on those facts clarify those set forth in *Weeks I.* The three buys of marijuana, which occurred on 27 and 29 January and 4 February 1982, were semi-controlled, not controlled buys inasmuch as the law enforcement observers did not see the actual transactions between SGT Harvey and the appellant. The transactions occurred inside the appellant's quarters. On each occasion the law enforcement personnel waited outside those quarters but in view of the quarters. SGT Harvey, the informant, was considered sufficiently trustworthy to be solicited by his commanding officer to be an operative, notwithstanding Harvey's pri-

or drug involvement. SGT Harvey agreed to cooperate with Naval Investigative Service (NIS) only hours before the 27 January transaction and was not given enough details of the operations, search techniques, surveillance practices, times, dates, places, etc., prior to the buys so as to permit him any opportunity to secret marijuana on his person or plant it in the vicinity of the appellant's quarters where he knew the contraband would be undiscovered and where he could get to the marijuana and where he could obtain possession of the marijuana with any degree of assurance that these activities would not be observed by the law enforcement officers and thereby result in his criminal prosecution. In assessing the strength of the Government's case, these facts are important to be considered along with SGT Harvey's eye-witness account of the transactions, the observation of SGT Harvey's movements by the law enforcement officers (NIS), the prior frisking and the subsequent finding of marijuana on the person of SGT Harvey at each transaction and the absence of the seed money on the person of SGT Harvey after each sale. The following factual analysis is detailed but not an exhaustive treatment.

*27 January 1982:* SGT Harvey and two NIS agents went to appellant's duplex quarters about 1800. It was nighttime, but there was a streetlight in the area. At those quarters SGT Harvey pointed out appellant's orange sports car to the NIS agents. The NIS agents parked about 150 feet away and uphill from appellant's quarters, where they observed SGT Harvey's movements to the house. SGT Harvey had been previously searched. This search precluded marijuana from being hidden on the appellant's person. Unbeknownst to SGT Harvey, the NIS agents did not park in a position to have an unobstructed view of SGT Harvey's entrance of appellant's quarters and they lost sight of him after he had walked a short distance up the entry walk to appellant's quarters. SGT Harvey did not know, however, what the NIS agents would do to observe him after he left the

NIS car. He only knew he was to return to the car after the deal was concluded. The appellant did not gain access to appellant's quarters until he invoked the name of a mutual friend, Finn. Once inside, SGT Harvey found that appellant would only deal in ounce quantities, whereas, the buy was set up for half an ounce. Being short of funds, SGT Harvey returned to the NIS agents and, after a time, the buy was reset for an ounce. They returned to the duplex and parked in about the same location. The scenario was repeated and the buy was completed on the second trip. NIS took custody of the marijuana. Aside from the proffered evidence of military character, appellant testified that he was not at home at the crucial times, but was in Woodbridge, Virginia and that his car was in his parking space until only 1630–1700. There is not room in this scenario for the truth of SGT Harvey's and the NIS agents' testimonies and, at the same time, the truth of appellant's version of the facts. Furthermore, the testimonies of the NIS agents and common sense corroborate SGT Harvey's version of the facts, while there is no corroboration of appellant's story.

*29 January 1982:* Two NIS agents, a civilian undercover officer and SGT Harvey returned for a second buy. Security procedures were again used on SGT Harvey and he was given the requisite cash. The agents parked their car in front of appellant's quarters and had an unobstructed view of the front door. SGT Harvey testified that he was let in, found a woman there, and appellant obtained the marijuana from the refrigerator, as he had on the first buy. Appellant and SGT Harvey discussed a pound buy and then appellant let SGT Harvey out the front door, the latter event being witnessed by NIS. Appellant, in contrast, testified that he was alone at this time and after he let SGT Harvey in the house he returned to his upstairs phone to finish a call which SGT Harvey's arrival interrupted. When he came back downstairs, appellant found SGT Harvey on the back porch looking at appellant's motorcycle. According to appellant, they discussed a selection of record albums which appel-

lant claimed SGT Harvey had bought from him about 21 January 1982. Appellant then let SGT Harvey out the front door. Minus the alibi, the thrust of the defense position was identical to that used for the 27 January event—SGT Harvey had previously planted marijuana on the premises (impliedly in the backyard) and framed appellant. SGT Harvey could not have previously planned, with any confidence, on access to appellant's backyard or sufficient freedom from NIS scrutiny to pick up hidden marijuana or move around the house to appellant's backyard on 27 January. Nor was he better situated to do so on 29 January, and could not previously count on appellant being home on either occasion. In respect to the claimed record album purchase, Finn testified as a defense witness that several months before the buys SGT Harvey told him he did not like appellant because of appellant's rank and his position as a brig SNCO. He claimed that SGT Harvey did not want his wife going to appellant's house with Finn's wife anymore (visits which had occasionally been made). Finn did not respect SGT Harvey's truthfulness. Not only did Finn admit being a good friend of appellant's and having a grudge against SGT Harvey, but the story of SGT Harvey's dislike for appellant does not jibe with appellant's claim that SGT Harvey was a friendly record album customer of appellant and that SGT Harvey would ask or expect credit on the purchase of records from appellant. We find that SGT Harvey's (and NIS's) version of the 29 January 1982 events has very strong circumstantial probability of accuracy.

*4 February 1982:* This buy was set up like the others, but involved a plan to buy an ounce of marijuana which ripened into a deal for a pound at a price of $230.00 when appellant said he only had half pound lots to sell. SGT Harvey testified that appellant was alone in his quarters when the sale took place. The NIS agents were parked in front of appellant's house again and observed SGT Harvey's entries and exits. Appellant also denied that this transaction occurred and marshalled two

witnesses in his defense. Appellant said that he and a long time friend McGowan (SSGT, USMC–Ret.) were at appellant's quarters. McGowan listened to records downstairs while appellant took a bath or shower upstairs. While appellant was bathing, SGT Harvey's arrival was announced to him by McGowan, who told appellant that SGT Harvey was there to pay for the albums he had bought on 21 January. According to appellant and another good friend, Antognoni, appellant got a phone call from the latter concerning his detecting of a black fatigue-clad Marine in appellant's backyard. McGowan testified that after SGT Harvey came into the house and saw that he had to wait for appellant he left the house, saying he had to check on his kids. SGT Harvey returned and left again a few minutes later. Upon his return this time, SGT Harvey sat down, got up again and went out back. At this point appellant came downstairs. According to McGowan, appellant asked if anyone was out back, to which McGowan replied that SGT Harvey was there. Appellant testified that he asked where SGT Harvey was, to which McGowan replied that Harvey was out at his car. According to the appellant and McGowan, SGT Harvey then knocked on the front door (not done on any other but the first entry) again and was let in, gave appellant $50.00 for the albums, got $20.00 in change and left. McGowan's testimony just does not jibe with the testimonies of the law enforcement officers as to either the number of entries and exits by SGT Harvey or SGT Harvey's having circled the house in order to leave by the back and return by the front door as McGowan claimed. Thus, aside from the practical problems with appellant's "frame" defense mentioned at the outset, the foregoing discrepancy renders appellant's defense implausible. Finally, McGowan was as certain that appellant was not wearing a field jacket that night as was Antognoni about the prowler, while the law enforcement officers and SGT Harvey testified that appellant wore his field jacket, thus the circumstantial probability of reliability of the Government's case is exceedingly strong.

We find that as to each transaction the Government's case is very strong, while the appellant's defense theory is, in fact, weak and implausible. Furthermore, when the evidence is considered as a whole, the Government's case becomes overwhelming. This is so notwithstanding the appellant's terse refusal to SGT Harvey in the company of an undercover law enforcement officer to sell more marijuana on yet another occasion, denying in the process that he sold marijuana. This was consistent with the caution the appellant exhibited when SGT Harvey first went to the appellant's quarters and couldn't gain access until he mentioned Finn's name.

■ Since, unfortunately, the admissibility of the evidence of military character was litigated via a motion *in limine* vice at the time of its offering, the precise evidence and the form in which it might have been offered is only generally known. We can only assume that it would have paralleled the evidence in extenuation and mitigation. We also assume the materiality of the evidence for purposes of this analysis. The principle defenses were alibi and frame, so military character evidence, while relevant, was not the crux of the defense. Service records reflect Vietnam service and a degree of good military character normally expected for an enlisted man who makes gunnery sergeant in his eighteenth year of active service and three meritorious masts for performance of duty since late 1981. Three superiors, a senior chief (Navy), a master gunnery sergeant (Marine) and a warrant officer (Marine), each of whom knew the appellant for about two years prior to the trial, testified essentially that the appellant had excellent to great military character, based on their knowledge of his performance of duty. Service records reveal a somewhat less spectacular career. In totality, we find the quality of the available defense evidence regarding appellant's military character was excellent. The record reflects that prior to entering its verdict the court knew that the appellant was a gunnery sergeant, had eighteen years or more of service and that he had

some citations and/or medals. Though the record does not specifically so state, it can be inferred that the appellant was in the appropriate service uniform with the ribbons and medals to which he was entitled properly displayed thereon—thus good conduct medals, Vietnam service, etc., was apparent. It was also known that he was promoted to gunnery sergeant in his eighteenth year of service, which is a good but not spectacular achievement. From this any reasonably experienced court-martial member would deduce that the appellant was obedient and an above average to excellent performer who had been in no significant difficulty with military authority. We find that this is essentially the picture that the court would have deduced had all of the documents and testimony been considered once the issue of military character was joined. Consequently, there was an adequate, though not complete, substitute for the evidence in the record. Synthesizing all of the ingredients of the *Weeks II* test we find that no amount of evidence of good military character would have affected the outcome of the trial, given the overwhelming posture of the Government's evidence on the merits. We are convinced beyond any reasonable doubt that the appellant was not prejudiced by the erroneous exclusion of the proffered evidence.

Our consideration of the merits of this case on remand has been limited to the issue specified in the decision of the Court of Military Appeals. We note, however, that the decision in *Weeks I* was set aside on the military character issue. Left unresolved was the issue of the obvious findings multiplicity of each group of possession, sale and transfer of marijuana offenses, each of which was premised on the same act of sale. Consequently, only so much of the verdict as finds the appellant guilty of sale of marijuana on 27 and 29 January and 4 February 1982 is affirmed. The remaining specifications are dismissed. Since the multiplicious offenses were treated as multiplicious for sentencing purposes, there is no prejudice to the appellant. Accordingly, the sentence as previously approved is also affirmed.

In accordance with the mandate of the Court of Military Appeals, the case is forwarded to the Judge Advocate General for forwarding to the higher court for final disposition.